# HERBERT W. SEYMOUR ᴇᴛ ᴀʟ. *v.* FINANCE & GUARANTY COMPANY.

[No. 43, April Term, 1928.]

*Decided July 16th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Richard B. Tippett* and *J. Royall Tippett,* with whom was *Roland R. Marchant* on the brief, for the appellants.

*J. Craig McLanahan* and *Enos S. Stockbridge,* with whom were *France, McLanahan & Rouzer* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The principal questions before us for decision on this appeal are, first, the sufficiency of the declaration; and, second, whether or not the plaintiff, by the conduct of its agents, has been estopped from prosecuting its claim as set up by the allegations of the declaration. The first of these questions is raised by the demurrer to the declaration, which was overruled by the trial court; and the second is presented by the exception taken to the ruling on the prayers. The case was tried by jury and resulted in a verdict and judgment for the plaintiff for the sum claimed in the declaration.

There is no dispute as to the correctness of the amount of the judgment, if the plaintiff is entitled to recover at all. The circumstances giving rise to the plaintiff's claim, most of which are admitted or proven, may be summarized substantially as follows:

William Hellbach was a contractor, engaged in the plumbing business, and in the spring of 1923 was awarded two plumbing contracts by the board of education of the City of Pittsburgh, in connection with the building of two schools in that city, one known as the David B. Oliver School, and the other the Peabody High School. During the progress of this work, Hellbach found it necessary to raise funds to carry on his business, including the two Pittsburgh school contracts; and in February, 1924, he consulted Roland R. Marchant, an attorney, as to means of securing the needed funds. As a result, Mr. Marchant, on behalf of Hellbach, made application to the Finance & Guaranty Company, the appellee, with that end in view, and presented a statement purporting to show Hellbach's financial condition as of February 1st, 1924. Among the items set forth in this statement were certain contracts for plumbing and heating then in process of installation. Two of these contracts were in connection with the Pittsburgh schools, and it was stated:

"Peabody and Oliver Schools, Pittsburgh, Pa., amount of contracts, $81,400.00. Amount paid, $32,-676.83. Amount due on open account, $27,809.30. Amount of reserval, $8,000.00."

After an examination of this statement, and further investigation made by the appellee, it entered into an agreement with Hellbach under date of February 26th, 1924, by which it was provided that the appellee would from time to time, during the continuance of the agreement, and within the limits agreed upon, buy such accounts belonging to Hellbach as might be acceptable to the appellee. It provides in detail the terms under which the accounts should be purchased, and the percentage of each which should be paid therefor. It further provides that Hellbach warrants that he will transmit or deliver to the appellee, at its office in Baltimore, Md., on the day of the receipt thereof, all original checks, drafts, notes, acceptances, and other evidences of payment received in payment of, or on account of, any accounts purchased under the agreement, and that each account offered for sale to the appellee shall represent a *bona fide* sale and delivery of property usually dealt in by Hellbach, and shall be for a certain, undisputed, liquidated claim or demand, which is due or to become due on the dates set forth; and F. R. V. Williams or K. F. Brown (the president and treasurer, respectively, of the appellee), or any person whom either of the named persons or the appellee might designate, is constituted the true and lawful attorney of Hellbach, with power to receive, open, and dispose of all mail addressed to him, and to endorse his name upon any notes, acceptances, checks, drafts, money orders, or other evidence of payment or collateral that may come into the possession of the appellee as payment of or upon accounts purchased by it. The agreement further provides: "Neither of the parties hereto shall be bound by anything not expressed in writing by and between the parties; this agreement and all of its provisions shall inure to and become binding upon the parties, their heirs, executors, administrators, successors and assigns only after

acceptance by two duly authorized officers of second party"
(the appellee). This agreement contains a number of other
provisions, but those we have referred to are all that are
necessary for a proper consideration of the case.

In pursuance of this agreement, Hellbach made a number
of assignments to the appellee. These were made on forms
which were headed "Certificates of Indebtedness." The first
of those involved in this case was made by Hellbach to the
appellee about February 26th, 1924, and purported to assign
accounts against the board of education of Pittsburgh amount-
ing to $27,809.30. The loan obtained on the strength of this
assignment was $13,330.28, it being the amount of money
needed by Hellbach at that time. This certificate of indebted-
ness certified that the persons named therein were indebted
to Hellbach in the sums set opposite their respective names
for goods sold, shipped and delivered to the persons named
therein, being the board of education of Pittsburgh, the
amount being $27,809.30, which was set forth as being due
March 10th, 1924. Following the above statement, there
appears:

> "In consideration of $1.00 and other valuable con-
> siderations, the receipt of which is hereby acknowl-
> edged, the undersigned hereby sells, assigns and sets
> over to Finance and Guaranty Company, its successors
> or assigns, all its right, title and interest in and to the
> open accounts and contracts above named represented
> by invoices and shipping documents delivered herewith
> aggregating $27,809.30 ($13,330.28), including all
> moneys due and to become due upon the same. * * * *
> The undersigned represents that the above schedule
> correctly sets forth undisputed open accounts and con-
> tracts now owing the undersigned for bona fide sales
> and deliveries of merchandise in accordance with speci-
> fications of the buyer * * * that the correct maturities
> of said open accounts and contracts have been set
> forth and that proper entries have been made on the
> books disclosing the absolute sale thereof to Finance
> and Guaranty Company, its successors or assigns.
> * * * The undersigned hereby acknowledges receipt

from Finance and Guaranty Company of the above open accounts and contracts for collection solely as agent for and under agreement existing with Finance and Guaranty Company."

The same form is used for each of the assignments or certificates of indebtedness involved in this case, all of which are signed William Hellbach, per Bertha M. Hellbach, or B. M. Hellbach. The certificate of indebtedness representing the second assignment was dated March 17th, 1924, and was of an account stated to be against the board of education of Pittsburgh in the mount of $4,600; while the third represented what purported to be an account against the board of education for $5,330, and was dated March 26, 1924; and the fourth being an account against the same party for $3,000, dated March 27, 1924. From the face value of each of the accounts represented by these respective certificates of indebtedness, the first of which, as stated, being taken for $13,330.28, certain deductions were made in accordance with the terms of the agreement; and after such deductions, checks for the respective balances were, on the respective dates of the assignments, delivered to Hellbach, the amounts of these checks being $10,147.66, $3,519.00, $2,385.45 and $2,295.00 respectively. These checks were accepted and used by Hellbach, and there is no dispute as to the amount of these payments, or the fact that Hellbach accepted them as being made in accordance with the terms of his agreement with the appellee. In the early part of March, 1924, Hellbach received from the board of education two checks payable to his order, each being dated March 7th, 1924, one for the sum of $1,299.84 for work on the Oliver School, and the other for $549.10 for work on the Peabody School. In accordance with the agreement, these checks, upon the receipt thereof by Hellbach, were by him endorsed in blank and turned over to the appellee, which deposited them and credited Hellbach's account with the total amount represented thereby. In April Hellbach received two further checks from the board of education, one for $1,873.02 on account of the Oliver School,

and the other for $639.95 on the Peabody School, payable to him. These checks were likewise endorsed and delivered to the appellee, and Hellbach given credit for the amount represented thereby.

Some time in the early part of April, Hellbach appearing to be in financial difficulties, certain of his larger creditors held a meeting to discuss his financial condition and see if any steps could be taken to help him. This meeting resulted in the call of a meeting of all of his creditors, which was held at his place of business in Baltimore City on the 18th day of April, 1924. At this meeting a large percentage of his creditors were present. Mr. Hoffman, the vice-president of the appellee, attended this meeting. Mr. Seymour, representing one of the larger creditors, acted as chairman of the meeting, stated its object, and read to the meeting a statement of Hellbach's affairs as it had been given to him by Hellbach, and which Seymour stated he believed was substantially correct. Seymour further stated that in his judgment it would be wise for the creditors to appoint a creditors' committee to complete the various contracts that Hellbach had on hand, as there was an apparent profit in each of these contracts if they should be finished, whereas if the contracts should be abandoned and the bonding company be allowed to complete them, each contract would probably show a loss. Referring specifically to the Pittsburgh school contracts, it was stated that there was an apparent or possible profit of from $25,000 to $27,000 if these contracts were completed. Mr. Seymour then asked for comments upon the proposed plan from any of the creditors present desiring to do so. A general discussion of the plan followed, resulting in a decision by the creditors present to appoint a creditors' committee for the purpose of completing Hellbach's contracts, including those on the two Pittsburgh schools.

The testimony of witnesses for both the appellee and appellants is in substantial accord as to what transpired at this meeting. As stated, the appellee was represented at this meeting by Mr. Hoffman, its vice-president, and there seems practically no dispute as to what his action was on that

occasion; Mr. Hoffman's testimony being that he (Hoffman), after hearing Seymour's statement, expressed himself as believing that it was wise for the creditors to finish the contracts, rather than to allow the bonding company to take charge, but that his company was a preferred creditor of Hellbach; that Mr. Seymour presented estimates as to what it would require, and that he heard the creditors' committee or the creditors then before the committee discussing whether or not it was advisable for them to go ahead and complete the job; that he heard it all, and heard them finally determine that it was for the best interest of the creditors to do it, but repeatedly stating that his company was a preferred or secured creditor; that he understood from what was said at that meeting that it would require $50,000 to complete the Pittsburgh contracts, which would result in a profit estimated at that time of $25,000; that he knew that this $50,000 necessary to complete the contracts would have to be secured from some source, but had no idea of what that source would be; that his company was in a different position than other creditors, they being general creditors, while his company was a secured creditor.

Philip B. Belt, the Baltimore cashier of the Crane Company, that company being the largest creditor of Hellbach, its claim amounting to $35,000, was present at the creditors' meeting, representing his company. His testimony as to what occurred at the meeting is: "Mr. Seymour (general sales manager of the Crane Company) opened the meeting in the presence of all the creditors present, and in the presence of Mr. Hoffman. Mr. Seymour stated there was a preliminary investigation made about the affairs of Hellbach, and that Mr. Seymour and some of the largest creditors decided that Mr. Hellbach could not continue without help. The meeting was called to lay these facts before the creditors to decide what could be done. A statement of Hellbach's contracts on hand was made and discussed. A full statement of Hellbach's affairs was discussed and his entire affairs at that meeting. Several of the creditors asked questions and had remarks to make. Mr. Seymour suggested that a creditors' committee be

appointed to take charge of Hellbach's affairs." Being asked if Mr. Hoffman got up and said anything, witness said: "Mr. Hoffman said that it would be the wise and proper thing to do, to finish the contracts. Mr. Hoffman stated the plaintiff's account was secured, and he thought it was a wise thing to finish the contracts. That after Mr. Hoffman made his talk to the creditors there was a creditors' committee appointed at that meeting, while Mr. Hoffman was there. Mr. Hellbach was to assign his assets to the creditors' committee, and the creditors' committee took over all his assets. The two Pittsburgh contracts were discussed at that meeting in the presence of Mr. Hoffman before the creditors' committee was appointed. It was estimated at that meeting that there would be a surplus after the Pittsburgh contracts were completed of some $27,000. Mr. Seymour made that statement, but a report was made by Mr. Hellbach and Mr. Hellbach's engineer, a Mr. Melvin. Mr. Hoffman made his talk before Mr. Seymour's statement as to turning over Hellbach's assets. Before Mr. Hoffman made his statement, Mr. Seymour had given a general statement of the conditions. * * * Shortly after Mr. Hoffman made his statement, Mr. Seymour said that Mr. Hellbach would turn over all his assets to the creditors' committee if a creditors' committee was appointed. Mr. Hoffman was present when that statement was made. Mr. Hoffman did not say anything else after the statement was made by Mr. Seymour that Mr. Hellbach would turn over all his assets to the creditors to complete these jobs, if the creditors' committee was appointed. The creditors' committee was named at that meeting, and there was no objection by anybody."

Mr. Marchant, being also present at the meeting, testified that he (the witness) made a statement at the meeeting, saying "that the contract was at a stand-still if Hellbach's affairs were not operated by somebody; that the bonding company would step in and the Finance & Guaranty Company and the creditors would lose everything that they had in it, and the job would be gone, and it was not probable that the creditors would receive anything at all if the bonding company

completed it. Witness remembers distinctly referring to the bonding company. There was a bond given for the completion of the work, made for the benefit of the board of education. Witness is certain that there was an assent of two or three creditors, with their experience with the completion of jobs by bonding companies. Something was asked about how the creditors would protect their money, Mr. Hoffman got up; he was sitting at the back of the room; I recall it very distinctly; and he said that there was in his judgment nothing else to do, or words to that effect, that the creditors ought to complete the job, that they have no equity in it if it was not completed, and in that way everybody would be benefited, and then the general discussion turned into how the creditors' committee should be organized. Some things were begun as to the draft of creditors' committee agreement, what powers they should be given, and the members of the creditors' committee were then selected," and witness' "recollection is that Mr. Hoffman was asked to serve on that committee. Mr. Hoffman then referred to the fact that his company held this assignment of the accounts, and he did not think that they wanted a representative on the committee, and somebody else was put in his place, and then the committee so selected were instructed to draft an agreement or employ counsel to draft an agreement, and the meeting formally adjourned. Mr. Hoffman, Mr. Seymour, and several of them discussed what would happen, and they were all in a hopeful frame of mind about the whole thing. Everybody thought that by sticking together they would work the situation out. That was the attitude of everybody towards the whole thing."

Subsequent to this meeting, and in pursuance of what had been agreed upon, a creditors' agreement was prepared, a copy of which is filed with the declaration, and which was sent to each of the creditors of Hellbach, together with a circular letter under date of April 18th, 1924. This letter was signed by the committee, and stated:

"You will recall that in the letter calling the meeting of the creditors of William Hellbach to be held on April 9, 1924, you were advised that Mr. Hell-

bach's assets amounted to approximately $194,000 and that his liabilities amounted to approximately $178,-000. In investigating some of the larger items among the assets no reason is found to change this statement. At a meeting of the creditors held on last Monday there were present or represented creditors whose claims aggregated approximately $164,000 out of the total indebtedness of approximately $178,000. The situation was considered at some length and all of the creditors agreed that the affairs of Mr. Hellbach should be handled by a creditors' committee, with authority to conduct the business or at least complete certain contracts on hand on which considerable work had been done. The undersigned were named to act as such a committee. An agreement has been prepared which we believe meets the requirements, a copy of which is enclosed herewith, and we urge that you affix your signature or acceptance and verify to us the amount of your claim. The committee is very anxious to take charge of the business as promptly as possible. The original agreement has been executed by Mr. Hellbach and the members of the committee. Should you desire any additional information, please address your communication to the committee, 651 W. Baltimore Street, Baltimore, Maryland, and your inquiries will receive prompt response. We urge that you act promptly in this matter."

The creditors' agreement was:

"This agreement made this eighteenth day of April, nineteen hundred and twenty-four, by and between William Hellbach, of Baltimore City, in the State of Maryland, hereinafter called 'Hellbach,' party of the first part, and H. W. Seymour, James P. McPhail, Sidney O. Blumenthal, George Clautice, Arthur E. Thain and J. H. Sieppel, of said city and state, hereinafter called the 'committee,' parties of the second part, and creditors of William Hellbach, who joined in these presents, parties of the third part.

"Whereas, Hellbach is now and has been engaged in the plumbing contracting business in Baltimore

City and in the conduct of said business has incurred and now owes various sums of money to persons, firms, and corporations, wihch he is unable to pay currently as demanded, and

"Whereas, at a meeting of the creditors of said Hellbach, held at his office in Baltimore City on Monday, April 14th, 1924 (at which said meeting creditors, whose claims aggregate more than ninety per cent. of the debtor's whole indebtedness were present or represented), his affairs were discussed and fully considered, and it was unanimously agreed by those present that it would be for the best interest of all the creditors to operate the business under the supervision of a creditors' committee; and at said meeting the parties of the second part were named to act as the committee of the creditors upon the conditions herein set forth, and

"Whereas, said Hellbach also being present at said meeting agreed to said arrangement and further agreed to transfer or cause to be transferred to said committee, free from all dower rights of his wife, the parcels of real estate hereinafter more particularly described.

"Now, therefore, in order to make effective the plans of the creditors as agreed upon at said meeting, and in consideration of the mutual covenants, promises and conditions herein contained, the parties hereto agree as follows:

"1. The said Hellbach hereby assigns and transfers to said committee all of his assets of every kind and description and wheresoever situate, and all cash on hand and in bank, accounts, bills and notes receivable, all contracts and rights in contracts of any kind and every kind, all equipment, tools, machinery, merchandise, and stock on hand, fixtures, automobiles, trucks, and every and all items of value now owned by him or to which he is entitled.

"2. The said Hellbach further agrees to transfer or cause to be transferred to the said committee or its control title in fee simple to all that tract of land and improvements thereon, situate on the north side

of the Magothy River near Gibson Island in Anne Arundel County, together with the appurtenances to said property, and also all that parcel of land and improvements thereon in Baltimore City, known as 651 West Baltimore Street; the said property to be conveyed to said committee free of any claim of dower, but subject respectively to two mortgages, one for fourteen thousand two hundred fifty ($14,250) dollars, and one for six thousand ($6,000) dollars.

"3. It is understood and agreed that the said assets shall be held, controlled, and disposed of by the said committee for the benefit of the parties of the third part to this agreement, and according to the terms and conditions hereof.

"4. When this agreement becomes effective, the said committee shall immediately take charge and control of the business of said Hellbach and shall proceed to conduct and operate the same, and in so doing convert all assets into cash as promptly as may be done, in their judgment, for the best interests of all the creditors.

"5. During the period of operation of the said business the committee shall have full power and authority:

"a. To do all things necessary to complete any and all contracts heretofore undertaken by said Hellbach or, in their judgment, to abandon any of said contracts.

"b. To make and enter into contracts for additional work and to do all things necessary to perform the same.

"c. To employ such agents and representatives, clerical and supervising help and labor as the committee, in its discretion, may from time to time deem necessary and proper, and fix and determine the compensation, and prescribe the duties of each and all of the agents and representatives so employed.

"d. To determine and fix the depository of the funds of said business and designate the person or persons who shall sign checks thereon and other obligations.

"e. To have free access and possession of all the books, contracts, documents, and papers of every kind and to have full information of all facts in the possession of said Hellbach pertaining to his business.

"f. To enter into contracts for the sale, and to sell and convey, mortgage, or otherwise dispose of real estate in the hands of said committee, and to hypothecate or sell stock and other assets in the hands of said committee.

"6. This agreement shall become binding and effective when the same has been executed by the parties of the first and second parts, and shall be approved or accepted by the creditors of the said Hellbach, whose claims amount to ninety per cent. of his indebtedness.

"7. The parties of the third part hereby extend the due date of all their claims or demands to December 1st, 1924, and further agree that they will not, nor will they suffer anyone else in their behalf, to enter any suit, claim or demand against the said Hellbach or the parties of the second part for the recovery of any amount due to them and incurred prior to the execution hereof. On or before December 31st, 1924, the said committee shall have the right to extend the time within which to pay the said claims of the parties of the third part or any unpaid balance thereof, to a date not later than May 1st, 1925; and the maturity date of said claims or the unpaid portion thereof may be further extended to any subsequent date which may be approved by eighty per cent. in amount of the claims of the parties of the third part.

"8. The said committee shall from time to time as funds accumulate in its hands, distribute the same ratably among the parties of the third part according to the amounts of their claims, and when and if all such claims shall be paid in full and the obligations of the committee discharged, all assets in their hands shall be reconveyed to the said Hellbach.

"9. All obligations incurred by said committee in the conduct of said business shall be a claim against

the assets in the hands of the committee prior to the claim of the parties of the third part.

"10. Any act approved by a majority of the committee, whether at meeting or otherwise, shall be the act of the committee. Any vacancy in the membership of said committee occurring by a death, resignation, refusal or' failure to act, shall be filled by the remaining members of the said committee.

"11. The members of said committee shall not be responsible or held personally liable for any of the debts or obligations of the said Hellbach, nor for any matters or thing whatsoever, except that each member of said committee shall be liable for his own willful misconduct, which may result in damage.

"12. The acceptance by any creditor of this agreement shall not release or waive any existing valid lien or pledge, but the same shall continue and attach to the extended indebtedness unless otherwise waived or abandoned, but any party hereto shall have the right hereafter to question the validity of any such lien or pledge.

"Witness the signatures of the parties hereto this day first above written."

The committee's letter and the copy of this agreement were received by the appellee, which, through its vice-president, replied on April 25th:

"Mr. H. W. Seymour, Crane Company, Baltimore, Md.
"WILLIAM HELLBACH.

"Gentlemen:

"Referring to your notice of April 18th, we beg to advise that inasmuch as we are secured creditors it will not be necessary for us to sign the agreement. We, however, are thoroughly in accord with your ideas, and if there is anything we can do to help you, kindly call on us."

The committee, after taking charge, received two checks from the Pittsburgh board of education payable to William Hellbach, dated May 8th, 1924, representing payments for

work and material done and furnished by Hellbach prior to the committee's taking charge, which were endorsed by Hellbach in blank and sent to the appellee, which deposited them to its credit, and credited Hellbach's indebtedness to them with the amounts thereof. One of these checks was for payment of the Oliver School contract amounting to $1,148.91, and the other on the Peabody School contract amounting to $1,167.51. These checks represented the last payments made by the Pittsburgh board of education on account of the two school contracts for work done and materials furnished by Hellbach; and the appellee received no payments after this time on account of Hellbach's indebtedness to it. The creditors' committee completed the contracts, acting through Hellbach as its agent, and received all of the payments made after that time by the Pittsburgh board of education. The committee supervised the payment of all expenses incident to the completion of the contracts. These operations resulted in the expenditure of about $6,000 over and above the amount received from the Pittsburgh board of education; or, in other words, there was a loss, growing out of the completion of the contracts by the committee, amounting to about $6,000. There is no suggestion or charge of any fraud, neglect, or incompetency on the part of the committee or its agents in the completion of this work, it being admitted that the loss resulted from causes beyond the control of the committee, such as advance in the cost of labor and materials, and delays caused by strikes of employees of the general contractor, Hellbach's contract being a subcontract.

We have set forth at greater length than is ordinarily necessary the facts, as disclosed from a study of the record, in order to determine the status of the parties and weigh their respective contentions. Certain pertinent facts are disclosed, among which are: That the Finance & Guaranty Company, at the time its money was turned over to Hellbach, believed that Hellbach was assigning to it accounts representing materials and work then furnished and done, the amount of said accounts being liquidated and ascertained and nothing remaining to be done in connection therewith, in

order to receive payment therefrom, except the arrival of the date on which they would be paid by the Pittsburgh board of education; that while the appellee was under this belief, it was a mistaken belief, and as a matter of fact, only a small portion of the amount represented by the accounts assigned was for materials and work furnished and done, the balance being for materials and work to be furnished and done in the future, the doing and furnishing of which were a condition precedent to any obligation on the part of the Pittsburgh board of education to pay therefor, or in other words, a very large proportion of the accounts was for money to become due; that the committee completed the contracts through Hellbach as their agent, without any notification whatever to the Pittsburgh board of education, and the payments for the operations under the contracts were made by checks payable to Hellbach, which he endorsed and turned over to the committee, with the exception of the two hereinbefore referred to, which represented work actually done and materials actually furnished before the committee took charge; that the appellee was present at the creditors' meeting and participated therein, through its vice-president, and was in accord with the purposes and plans of the creditors in so far as they applied to general creditors, but stated and reiterated the fact that it was not interested as a general creditor, because it occupied the position of a secured creditor, this position being due to the fact of its being the assignee of the accounts turned over to it by Hellbach; that the creditors' agreement, of which the appellee had notice, provided that all expenses incurred by the committee in the completion of the contracts should be returned to it before any distribution could be made to the creditors.

The first question, therefore, is: Did the appellee, by virtue of the assignment of the accounts, and the agreement between it and Hellbach, become entitled not only to payments then earned, but also to future payments representing moneys earned subsequent to the committee's taking charge of the contracts between Hellbach and the Pittsburgh board of education? The answer to this depends upon whether or not

moneys earned after the assignment to the appellee are the proper subject of an assignment. It was not necessary that the Pittsburgh board of education should be notified of the assignments to make them valid. *McDowell, Pyle & Co. v. Hopfield,* 148 Md. 84. The assignment in that case was of an account representing merchandise actually delivered to McDowell, Pyle & Company, for which payment was due at a specified future date, and the contention was between the assignee of that account and an attaching creditor of the party who sold the merchandise to McDowell, Pyle & Company. This court decided that the title to the fund represented by the account was in the assignee thereof, even though McDowell, Pyle & Company had no notice of the assignment at the time the attachment was laid in its hands. That assignment dealt with money which had been earned by the delivery of the merchandise, and not with money to be earned after the assignment, and therefore that case is not authority on the question now under consideration, namely, the assignability of an account representing money yet to be earned.

The weight of authority seems to be to the effect that a debt which has actual or potential existence is the proper subject of an assignment. The debt here, at the time of the assignment, had no actual existence, because it had not then been earned, but it did have a potential existence. In *Ann. Cas.* 1912A, 678, in the notes to the case of *King Bros. & Co. v. Central of Ga. R. Co.,* there appears a reference to *Allison v. Pearce* (Tenn. Ch.), 59 S. W. 192, in which the court said: "While, properly speaking, say some of the authorities, an assignment cannot be made of a subject which does not exist, such as a fund to become due on the future performance of a subsisting contract, * * * yet equity, on the possible debt ripening into an enforceable specific money liability, treats the agreement as an assignment *pro tanto* of the fund, and by force thereof vests the equitable title to the money in the assignee. *Field v. New York,* 6 N. Y. 179, 57 Am. Dec. 435, note; *Hall v. Buffalo,* 1 Keyes (N. Y.) 193; *Brill v. Tuttle,* 81 N. Y. 454, 37 Am. Rep. 515." And in *Campbell v. Grant Co.,* 36 Tex. Civ. App. 641, 82 S. W. 794,

it was held that, where a building contract provided that the stipulated price should be payable in installments as the work progressed, the debt accruing thereunder from the owner to the contractor had a sufficient potential existence, after the contract was made, to sustain a parol equitable assignment of a portion thereof to the contractor's surety; and, in reply to the insistence of counsel that the debt assigned had neither an actual nor a potential existence, the court said: "Potential, as defined by Mr. Webster, means 'existing in possibility; anything that may be possible'; and potential existence, it has been said, means 'that the thing may be at some time.'"

In the case of *Shaffer v. Union Mining Co.*, 55 Md. 74, which involved the question of the assignability of wages yet to be earned, this court said: "These orders are for the payment of wages already due, and for wages yet to be earned, and to become due; * * * The fact that wages to be earned, and not then earned, were included in the order (if there was no collusion to evade the law), could not affect the recovery for so much wages as might be due when the order was given, if the unearned wages were not assignable. The learned judge who decided this case below, says in his opinion that: 'The current of authority seems to establish the proposition that such assignments are valid, provided the assignor at the time of the assignment is under a contract of employment, but that if he is not, then the assignment is invalid.' We express no opinion upon that question, because the admission of facts does not meet the requirements of those cases wherein such assignments have been upheld. It does not appear from the evidence that there was such subsisting binding contract for service to be rendered, and payment to be made for it, which binds the employee to render service and the employer to receive that service and retain in his employ, as has been held (in those cases affirming such assignability), to be necessary to support it." While the court in that case expressed no opinion upon the question, the inference from the language used is that such assignments are valid, provided there is an existing enforceable contract under the terms of which future payments were to become due.

In *Hammon on Contracts,* p. 730, the author says: "However, the right need not be vested in order to be assignable. A common illustration of assignment enforced in equity is the assignment of a future interest. Equity will support the assignment of contingent interests and expectancies,—things which have no present actual existence, but rest in mere possibility,—if fairly made, and not against public policy, not as a transfer operating *in praesenti,* for that can be only of a thing *in esse,* but as a present contract to take effect and attach as soon as the thing comes into being," citing for this proposition, among a number of others, the case of *Cutting Packing Co. v. Packers Exchange,* 86 Cal. 574, holding that where fruit contracted to be sold for a series of years is to be the product of trees owned by the seller at the time the contract is made, it must be considered as having a potential existence at that time, and as being subject to sale; and an assignee of such contract acquires the right to purchase the fruit for each of the seasons subsequent to the assignment, and assumes the burden of paying the contract price for it.

The great majority of cases involving this question appear to arise where the assignee is attempting to assert his assignment of money yet to be earned against the debtor of the assignor, and it seems to be firmly established that this can be done only by resort to a court of equity. In that class of cases the thing sought is to compel the debtor to recognize the assignment, and when the thing, which only has potential existence at the time of the assignment, comes into actual existence, to compel its payment to the assignee instead of to the assignor.

The case before us does not present this aspect, for the reason that the Pittsburgh board of education has made full payment under its contract to Hellbach, who has turned it over to the creditors' committee. Therefore the question of the necessity of going into equity to enforce the assignment is obviated. It is not necessary to resort to equity to establish the validity of the claim, because it exists whether it is enforced or not, but is necessary in order to compel recognition of the claim by the debtor. This case, therefore, resolves

itself into the question of recovering money from the creditors' committee which rightfully belongs to the appellee, by reason of its claim arising out of the assignment of moneys then to be earned, but which have now come into existence by being actually earned.

It must be remembered that the suit here is not against the Pittsburgh board of education, the debtor under the contract between it and Hellbach, but is a suit against the creditors' committee and the members of that committee individually, upon the theory that the money which it or they received from the Pittsburgh board of education belongs, under the contract between the appellee and Hellbach, to it, and, in effect, is a suit to recover money in the hands of the appellants under the count "money had and received." It is conceded that if Hellbach had completed the contract and collected this money, and the checks representing payments .made by the Pittsburgh board of education had been turned over to him, these checks would have represented money which belonged to the appellee, and which Hellbach, under his agreement with it, was bound to turn over to it when and as received, the recovery of which would have been the proper subject of a suit at law. On the other hand, it is clear that if Hellbach had abandoned his contract with the Pittsburgh board of education and his bondsman had completed the work, those payments, unearned at the time of the assignment, would have belonged to the bonding company, and the appellee could have had no interest therein by reason of the assignment. This latter result would also have obtained in case Hellbach had assigned his contract with the Pittsburgh board of education to a stranger, if such stranger had earned the future payments by the expenditure of his own funds for the completion of the contract. In other words, the assignment to the appellee could only affect payments made which were earned by Hellbach at the time of the assignment, or those earned *by him* subsequent to the assignment.

The question raised, therefore, is: Do the appellants occupy the position of strangers, or are they, in substance and effect, Hellbach? We are of the opinion that the appellants

stand in the same position as, and are equivalent for the purposes of this suit to, Hellbach. While it is true they took an assignment of the contract which Hellbach had with the Pittsburgh board of education, along with the assignment of all his other property and assets, the assignment of the contract was not complete, so as to enable the appellants to demand payment from the Pittsburgh board of education, the evidence showing that the appellants particularly refrained from putting themselves in that position, for fear that the Pittsburgh board of education would not recognize their substitution for Hellbach. They did not notify the Pittsburgh board of education of any change in the parties to its contract, but allowed Hellbach to go on and complete the contract in the same manner as if his assets had not been assigned to them, he receiving future payments by checks drawn to his order. The business was conducted by Hellbach with the assistance of his sister, who had been his secretary prior to the arrangement with the creditors, from his old office and in the name of Hellbach, supervised by the creditors' committee in so far as paying for labor and materials for the completion of the contract, the committee having control of this by reason of the fact that Hellbach's bank account, while still in his own name, could only be drawn upon by checks signed by him together with a certain designated member or members of the committee.

When we come to determine whose money or credit was employed in the completion of the contract, we are bound to conclude that these were furnished by Hellbach's estate. The only thing in this respect which the committee did was to secure from the general creditors of Hellbach an extension of the time at which their respective claims would be enforceable, the effect of which was to place at the disposal of the creditors' commitee the whole of Hellbach's estate, to be used in the completion of the contracts in question. The agreement with the general creditors provided that the expenditures made in the completion of the contracts should be paid back before anything was distributed to the creditors signing the agreement. At the creditors' meeting the estimated

amount necessary for the completion of the contracts was $50,000, and while the estimate was $10,000 or $12,000 short of the amount actually necessary, there was collected from the Pittsburgh board of education by the committee, through Hellbach, the sum of $54,776.81. The whole of this amount was not withheld until the completion of the work, but payments were made monthly in accordance with the progress of the work; and it is therefore clear that the committee was called upon to advance from time to time only a portion of the cost of completion. It is also evident from the record that the assets of Hellbach turned over to the committee, when freed from the claims of the general creditors, were amply sufficient to raise the advancements necessary for the completion of the contract. So far as its operations were concerned, the committee was financially in the position in which Hellbach would have been, owning his estate, with no general creditors.

This being the situation, and there being no evidence in the record that any money was advanced or loans negotiated by the committee, the inescapable inference is that it used the assets of Hellbach to complete the Pittsburgh contract. The appellee did not sign the creditors' agreement, and the assignment by Hellbach to it of moneys to become due, as well as moneys due, under the contract, being valid as against Hellbach, it is equitable, and we see no legal obstruction to requiring the committee, which had the use of all of Hellbach's assets to complete the contract, to be charged with such liabilities as would have been enforceable against him. These payments having been made to the committee under the contracts originally entered into by Hellbach and completed in his name, wherein his assets were used to bring about such completion and payments, we think the obligations incurred with the appellee by Hellbach are properly collectible out of such payments now in the hands of the committee. The committee represented the general creditors, and it was thought at the time of the creditors' agreement that the completion of these contracts would result in a profit, but it was possible for it to result, as it did, in a loss, and this was the risk

assumed by the general creditors, no part of which they could transfer to the appellee.

It follows, from what has been said, that in our view the declaration was good for the recovery of money in the hands of the appellants belonging to the appellee, and the demurrer was properly overruled.

The contention made by the appellants in reference to estoppel is unsound, in the view we have taken of the case. The actions and expressions of its agents, relied upon to constitute an estoppel, all show that such conduct was induced by the belief on its part that the accounts assigned by Hellbach to it had been earned by Hellbach at the time of the assignment, although the agreement with Hellbach was comprehensive enough and did include moneys due and to become due. It is fundamental that where acts or words of a party claimed to constitute an estoppel are set up as a defense, it must be shown that the acts were done and the words spoken with full knowledge of the true condition. If, therefore, the appellee thought it was secured by the assignment of accounts representing money earned and due, when in reality it partially represented money to be earned in future under the existing contract, such conduct does not constitute an estoppel. We find nothing in the record with respect to the conduct of the appellee sufficient to constitute an estoppel. Throughout the whole negotiation preliminary to and in consummating the creditors' agreement, it consistently maintained that it was a secured creditor, and therefore not interested in the creditors' agreement, under which the Pittsburgh contracts were to be completed. It ought also to be noted that, from the time the committee took charge of Hellbach's assets, it was in possession of all the information which Hellbach had, and this included knowledge on their part of the contents of Hellbach's agreement with the appellee, and further, that the assignments made by him to it were for amounts then to be earned. They were therefore charged with the knowledge that, if they completed the contracts in Hellbach's name, using his assets for that purpose, the money coming into their hands as payments in pursuance

of the contracts would be chargeable with the assignments made to the appellee.

Entertaining the views herein expressed, we think that the theory upon which the case was tried and presented to the jury was correct; and finding no error in the rulings of the lower court, the judgment must be affirmed.

*Judgment affirmed, with costs.*