**ASSOCIATED SEED GROWERS, Inc**
**GEIB et al.**
**No. 4887.**

Circuit Court of Appeals, Fourth Circuit.
Feb. 12, 1942.

Rignal W. Baldwin, Jr., of Baltimore, Md., and Thomas J. Keating, Jr., of Centerville, Md. (Semmes, Bowen & Semmes, of Baltimore, Md., on the brief), for appellant.

G. Elbert Marshall, of Easton, Md., and W. Brewster Deen, of Denton, Md. (William J. Rickards, of Denton, Md., and T. Hughlett Henry, of Easton, Md., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Associated Seed Growers, Inc., of New Haven, Connecticut, filed a claim in the sum of $14,638.52 as a secured creditor in the bankruptcy proceedings of the Talbot Canning Corporation of Maryland which were instituted on March 9, 1939. The

claim was based on shipments of seeds grown by Seed Growers under contract with the Canning Corporation. The Security consisted of assignments by the Canning Corporation of monies that were expected to come into the hands of A. W. Sisk & Son of Preston, Maryland, canned goods brokers who furnished all of the cans needed by the canner, and were given the exclusive right to sell all of the canner's output. After the bankruptcy the brokers, having paid themselves the debt due them by the canner out of the proceeds of the sale of the goods, turned over to the trustee in bankruptcy a balance of $8,081.09, to which Seed Growers now make claim. The questions are, (1), whether the assignments were valid, and (2), whether they constituted voidable preferences under the Bankruptcy Act. The District Judge decided the first question in favor of the claimant and the second question against it, whereupon this appeal was filed.

For a number of years prior to 1937, the canner and its predecessors had been engaged in packing canned goods at Cordova and Willoughby on the Eastern Shore of Maryland. On January 12, 1937, as in prior years, it entered into contracts with Seed Growers for the growth and delivery of certain quantities of bean and pea seeds at certain prices. The contracts contained the provision that if at any time the financial condition of the purchaser should become unsatisfactory to the seller, the latter could require payment in advance of the delivery of the goods, and, in event that such payment was not made, could cancel the contract or demand damages for the buyer's breach. Seeds to fill this contract were grown during the season of 1937 and were delivered to and used by the canner in the following year.

On or about December 7, 1937, Seed Growers deemed the financial condition of the canner unsatisfactory, but instead of asking for payment in advance it began negotiations to obtain security for the indebtedness to arise under the contract upon delivery of the seed. As a result of the negotiations, it was verbally agreed in the month of December, 1937, that if the canner would get the brokers to lay aside certain monies out of the sale of the canned goods and pay Seed Growers, the latter would deliver the seed. Accordingly, the canner made a written assignment on February 3, 1938, in the form of a letter addressed to the brokers at Preston, Maryland, directing

them to pay to Seed Growers the sum of $14,150.25 from the proceeds of the sale of goods to be manufactured by the canner in the season of 1938. This assignment was accepted by the brokers in writing and a copy was sent by the canner to Seed Growers on February 5, 1938.

In the meantime, on December 31, 1937, the canner had entered into a formal contract with the brokers whereby they agreed to sell to the canner and the canner agreed to buy from them all the cans and other supplies that it might require in the years 1938, 1939 and 1940 for its packing operations, title to all cans filled or unfilled to remain in the brokers until all indebtedness due them should be paid; and the brokers were given the exclusive right to sell and invoice all the canned goods on a five per cent commission; and the brokers were authorized to collect the accounts and pay themselves out of the proceeds, and remit any balance to the canner or to whomsoever might be entitled thereto. This sales contract was duly recorded pursuant to the requirements of the Maryland statutes affecting conditional sales. The money to be collected by the brokers under this contract was the subject of the assignment of February 3, 1938.

Certain details of the contracts between the canner and Seed Growers and of the letter of assignment from the canner to the brokers must now be more fully set out as they have a bearing upon the questions to be decided. The written contract of January 12, 1937 between the canner and Seed Growers above outlined called for the growth of 216,000 pounds of Asgrow Alaska pea seed at $.055 per pound, and 22,500 pounds of Henderson Bush lima bean seed at $.0875 per pound, f.o.b. Cordova. On February 5, 1938, after the assignment of February 3, 1938 had been made and accepted by the brokers in furtherance of the verbal agreement of December 1937 between Seed Growers and the canner, the latter wrote to Seed Growers enclosing a copy of the assignment and requested a modification of the contract of January 12, 1937, in regard to the character of the shipments to be made. Instead of the seed above described Seed Growers were requested to ship to the canner in carload lots 168,000 pounds of Asgrow pea seed, 25,500 pounds of Asgrow stringless bean green pod seed, 28,200 pounds of Henderson bush lima bean seed. These amounts figured at the original contract prices for

the first and third items, and at $.095 for the second item, totalled the amount of $14,150.25, which was stipulated in the assignment of Febuary 3, 1938 to be paid by the brokers to Seed Growers. The letter of February 5, 1938 also requested another modification of the original contract in that it asked that the cars be shipped prepaid; and as we have seen, the copy of the assignment of February 3 which accompanied the letter of February 5 showed that Seed Growers had waived its right to demand payment for the seeds in advance of delivery, and in place thereof, had accepted the assignment whereby payment for the goods was secured.

Thus in three material particulars the contract evidenced by the letter of February 5, 1938 differed from the original contract between the parties. No shipments of seed were made until after the receipt of this communication by Seed Growers, and no shipments would have been made if the security had not been furnished. The first shipment of seeds was made on February 16, 1938, and shipments continued until June 2, 1938, when the shipment of all the seed called for by the contract was completed. In short, Seed Growers accepted the terms of the contract of February 5, 1938, and made its shipments in accordance therewith.

The letter of assignment of February 3, 1938, addressed to the brokers, after summarizing the contract between the canner and the brokers, stated that the canner was indebted to Seed Growers in the aggregate sum of $14,150.25 on account of the purchase of seed, and that the canner and Seed Grower had agreed that the canner should authorize the broker from time to time to pay over to Seed Growers on account of the indebtedness certain named sums per case of canned goods sold by the brokers until the sum of $14,150.25 should have been fully paid, and to pay any balance remaining in the brokers' hands to ·the canner after reimbursing the brokers for any monies due them.

The statement that the canner was then indebted to Seed Growers in the sum of $14,150.35 was misleading, for no such debt was then in existence. Prior to the verbal agreement of December 1937 between the parties, the canner was obligated under the written agreement of January 12, 1937 to take, and after delivery to pay for the goods described therein; but Seed Growers had indicated that it would exer-

cise its option under the contract not to ship the goods. Had it stood upon its rights, as outlined in the contract, it could have demanded that the canner pay for the seeds in advance of delivery; and in the event that such payment was not made within ten days, it could have cancelled the contract or demanded payment of damages for breach of contract; but neither course would have given rise to a debt of $14,150.-25. Instead of exercising either option, Seed Growers, as we have seen, agreed to change the contract by accepting and shipping larger orders for seeds, freight prepaid, and by accepting an assignment as security for payment. It is clear, therefore, that the sum of $14,150.25 did not represent a past indebtedness on February 3, 1938, but merely the amount of a new bill of goods that the carrier was about to request Seed Growers to ship; and it is equally clear that the new order would not have been filled if the assignment had not accompanied it. The oral testimony in the case corroborates this conclusion. In short, the assignment was not given for an antecedent debt but for a present consideration, and since Seed Growers complied with the new contract by shipping the goods, it is entitled to the benefit of the assignment if the assignment is otherwise valid.

■■■ It follows that an essential element of a voidable preference, defined in Section 60, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. a, is missing; and hence the second question listed above should have been decided in the claimant's favor. It is true that no monies came into the brokers' hands to which the assignment could attach prior to the filing of the petition in bankruptcy; but the validity of an assignment is to be tested by reference to the time when it is made, and if it is not preferential then, it does not become so because the funds assigned came into the debtor's hands within four months of bankruptcy. Union Trust Co. v. Townshend, 4 Cir., 101 F.2d 903.

With regard to the validity of the assignment, we are in accord with the views of the District Judge. There is no dispute as to the correctness of his holding that as the assignment was executed and accepted in Maryland, it is governed by the Maryland law. Nor is there any dispute that the Maryland decisions adhere to the rule generally held that a right expected to arise in the future under a contract or

employment in existence at the time of the assignment can be effectively assigned. Restatement Contracts, Section 154; Williston on Contracts, Rev.Ed., Sec. 413; Hamilton v. Rogers, 8 Md. 301; Pen Mar Co. v. Ashman, 152 Md. 273, 279, 136 A. 640; Seymour v. Finance & Guaranty Co., 155 Md. 514, 530, 533, 142 A. 710; Baust v. Commonwealth Bank, 158 Md. 280, 283, 148 A. 236; Shaffer & Munn v. Union Mining Co., 55 Md. 74; In re Seim Construction Co., D.C.Md., 37 F.Supp. 855, 858.

■ But the assignment is attacked on the ground that the subject matter had neither an actual nor a potential existence when the assignment was made. At that time no goods had been manufactured—indeed no contracts for the growth of the vegetables had been made. Moreover, it is contended that no contract then existed under which the funds assigned could be expected to arise. There was the contract of December 31, 1937 between the canner and the broker covering the season of 1938, but it is said that in this contract the canner made no promise to produce any specified kind or quantity of goods, or, for that matter, any goods at all. We think this argument takes too narrow a view of the contract and of the rule which requires that the fund or property must have at least a potential existence when the assignment is made. While the canner did not expressly agree to pack any goods, the execution of the contracts for seeds and for cans, and for the sale of the goods to be manufactured, clearly shows that the active operation of the cannery during the season of 1938, as in the past, was contemplated by all the parties. Moreover, there was a binding contract on the part of the canner to buy all of the cans he should need from the brokers, and on their part to make sale of the manufactured goods. We think that these circumstances justify the statement that a right to the proceeds of the sale was expected to arise from a contract, or in other words, that the fund had potential existence when the assignment was made.

The judgment of the District Court must be reversed and the case remanded for further proceedings. Whether or not the fund was liable for any part of the expenses of the bankruptcy proceedings was not passed on by the District Court, and we are not in a position to pass on it here.

Reversed and remanded.