In re TALBOT CANNING CORPORATION.
No. 9218.

District Court, D. Maryland.
Nov. 13, 1940.

Z. H. Stafford, of Easton, Md., for bankrupt.

W. Brewster Deen and Wm. J. Rickards, both of Denton, Md., for trustee.

Thomas J. Keating Jr., of Centreville, Md., for Associated Seed Growers, Inc.

T. Hughlett Henry, of Easton, Md., for objecting creditors.

COLEMAN, District Judge.

In this case we are called upon to review certain findings of the Referee in Bankruptcy. Among the creditors of the bankrupt, the Talbot Canning Corporation, is the Associated Seed Growers, Inc., of New Haven, Connecticut, which duly filed in the bankruptcy proceedings its claim as a secured creditor in the sum of $14,638.52. The Referee in Bankruptcy, following objections filed by the Trustee and certain general creditors, refused to allow this claim as a secured one and, accordingly, the Associated Seed Growers, Inc. filed a petition for review of the Referee's decision. It is this decision which is now before us.

For our purposes, the material facts about which there is no dispute and which are given at some length in the findings of fact by the Referee, may be adequately summarized as follows: On December 31st, 1937, the bankrupt entered into a formal contract with A. W. Sisk & Son, of Preston, Caroline County, Maryland, canned goods brokers, whereby the latter were to furnish the bankrupt with all cans and other supplies that it might require in the years 1938, 1939 and 1940 for its packing operations, title to the same to remain in the brokers until all indebtedness due them was paid; the brokers were given the exclusive right to sell and invoice all canned goods, for which a 5% commission was to be paid them; they were to collect and guarantee payment of these accounts, apply the proceeds to the payment of their commissions, and remit any balance to the bankrupt, or "to·whomsoever may be lawfully entitled thereto." This conditional sales contract was duly recorded, pursuant to the requirements of the Maryland law.

For some time prior to the above mentioned contract between the bankrupt and its canned goods brokers, the present petitioner-creditor, the Associated Seed Growers, Inc., had been growing and selling seeds to the bankrupt on credit, pursuant to written contracts which contained the provision that if the financial condition of the buyer became unsatisfactory to the seller, the latter might require payment in advance of delivery. On December 7th, 1939, the seller, deeming the financial condition of the buyer, the present bankrupt, unsatisfactory, instead of insisting upon strict compliance with the terms of its contract as just stated, demanded security of the bankrupt, with the result that two assignments were made by the bankrupt, in favor of the Associated Seed Growers, Inc., one on February 3rd, 1938, and the other on March 19th, 1938, in the form of letters addressed to A. W. Sisk & Son, the canned goods brokers, and accepted by them in writing. The following paragraphs from the second of these letters disclose the material parts of both letters:

"On February 3, 1938, we wrote you that we were indebted to the Associated Seed Growers, Inc., New Haven, Conn. in the aggregate amount of $14,150.25 on account of purchase of certain lima bean, stringless bean and pea seed and in said letter it was agreed between the Associated Seed Growers, Inc. and ourselves that we would authorize, empower and direct and order you to pay over from time to time to said Associated Seed Growers, Inc., or to whomsoever they may direct toward the payment of

said indebtedness of $14,150.25, such sum or sums, remaining in your hands after payment of all accounts and notes payable to you and all money advanced by or due you, for commission or otherwise, under the terms of the aforesaid contract between us, dated December 31, 1937, as shall be equivalent to 20¢ per case for each case canned peas, 6¢ per case for each case of canned lima beans and 4¢ per case for each case canned stringless beans packed at our aforesaid Cordova and Willoughby factories during the year 1938 previously sold and invoiced and collected for by you pursuant to terms of said contract dated December 31, 1937, until the aforesaid sum of $14,150.25 shall have been fully paid to said Associated Seed Growers, Inc. such payments to be made by you monthly and all to be secured by and subject to the terms, conditions and provisions of said contract dated December 31, 1937.

"Since our letter of February 3, 1938, the pea seed which was included in the aggregate sum of $14,150.25 has been shipped and we find that it was necessary for us to make an additional purchase of 700 bushels of pea seed, increasing our debt to the Associated Seed Growers, Inc. by $2,310.00, now making an aggregate sum of $16,460.25. We therefore respectfully request that this letter be made a part of our letter of February 3, and the amount that we consider due the Associated Seed Growers, Inc. be $16,460.25.

"In the event the total amount of money paid by you as above directed to Associated Seed Growers, Inc. or to whomsoever it may direct, out of the balance remaining in your hands after payment of all accounts and notes payable to you and all money advanced by or due you, for commission or otherwise, under the terms of the aforesaid contract between us, dated December 31, 1937, at the rate of 20¢ per case for each case of said canned peas, 6¢ per case for each case of said lima beans and 4¢ per case for each case of said stringless beans, sold, invoiced and collected for by you as aforesaid, shall be insufficient to pay and satisfy, in full, the said indebtedness due Associated Seed Growers, Inc., we further authorize, empower, direct and order you to pay the balance due Associated Seed Growers, Inc. from the proceeds of the sale of other canned goods packed at our factories aforesaid, in 1938, and sold and invoiced and collected for by you in accordance with the terms of our aforesaid contract, dated December 31, 1937, and re-maining in your hands after payment of all accounts and notes payable to you and all money advanced by or due you, for commission or otherwise, under the terms of the foresaid contract between us.

"You are further hereby authorized, empowered, directed and ordered to charge any and all payments made by you pursuant to our account with you, and in any and all settlements hereafter made between us, you shall be entitled to full credits for all such payments to the same extent and effect as though said payments had been made directly to us on the respective dates thereof."

It is these assignments which are the basis of the present controversy. The first, it is to be noted, was clearly for an antecedent debt, namely, past due accounts. This is also true with respect to the later assignment if we accept its wording literally. That is to say, it recites after referring to the first letter of assignment dated February 3, 1938, and the indebtedness which it covered, "that it *was* necessary for us to make an additional purchase of 700 bushels of pea seed, increasing our debt to the Associated Seed Growers, Inc. by $2,310.00, now making an aggregate sum of $16,460.25. We therefore respectfully request that this letter be made a part of our letter of February 3, *and the amount that we consider due the Associated Seed Growers, Inc.* be $16,460.25." (Italics inserted). Unfortunately, it is not possible to determine with accuracy from the testimony taken before the Referee, whether the indebtedness on account of the later purchases aggregating $2,310 was, in fact, incurred prior to the time of the second assignment. The testimony is vague and indefinite on this point, —a fact to which we will hereinafter allude.

Pursuant to these two letters of assignment, Sisk & Son made payments to the Associated Seed Growers, Inc., for the account of the bankrupt up to and including July 18th, 1938, withholding payments thereafter, being apprehensive that what was due them as brokers might not be fully liquidated. As already stated, an involuntary petition in bankruptcy was filed on March 9th, 1939, against the Talbot Canning Corporation. It appears that from March 9th, 1939, until final disposition had been made on December 31st, 1939, by the Trustee in Bankruptcy, pursuant to orders of this Court, of all goods coming into

his hands and warehoused for the account of the bankrupt, the total sales amounted to $87,083.24; also, that on March 9th, 1939, when the petition in bankruptcy was filed and more than four months prior thereto, there was a balance of $14,638.52 due the Associated Seed Growers, Inc., for deliveries of seed which had been made between February 16th and June 2nd, 1938. However, Sisk & Son never had in their hands, prior to bankruptcy, any net proceeds received from sales of the 1938 pack after deduction of all sums due them, pursuant to their contract with the bankrupt dated December 31, 1937, although subsequently to bankruptcy the trustee held, and still holds, net proceeds in the amount of $8,081.09. It is upon this sum that the Associated Seed Growers, Inc., claims it has an equitable lien, by virtue of the two assignments, which has priority over the claims of the general creditors of the bankrupt, in the liquidation of its claim of $14,638.52.

The unsecured debts of the bankrupt are far in excess of its total assets and approximate $70,000, a great part of which represents sums due farmers for their vegetable crops, all of which they shipped to the bankrupt for packing prior to March 9th, 1939, but subsequently to March 19th, 1938, that is, after the date of the last assignment just referred to, pursuant to written contracts with the bankrupt, most, if not all, of such contracts having likewise been made after that date. Prior to bankruptcy, these farm-creditors had no knowledge of the assignments to the Associated Seed Growers, Inc., or any knowledge, apart from the constructive notice by reason of recordation, of the contract of December 31st, 1937, between the bankrupt and Sisk & Son.

■ There are two major questions presented: (1) Whether the assignments are valid under Maryland law, which governs because the assignments were completed in Maryland (when Sisk & Son accepted them, T. J. Wilson & Co. v. Carson & Co., 12 Md. 54; Smith, Trustee v. Penn American Plate Glass Co., 111 Md. 696, 77 A. 264) and this is true apart from Erie R. R. Co. v. Thompkins, 302 U.S. 671, 58 S.Ct. 50, 82 L. Ed. 518, which gave new vigor to the binding force of State decisions; and (2) whether, even though valid under Maryland law, they are to be accorded priority under the Bankruptcy Act.

The Referee in Bankruptcy reached the conclusion that both assignments were invalid because their subject matter had neither actual nor potential existence at the time the assignments were made; and so holding, he gave little consideration to the effect of the Bankruptcy Act.

■ Taking these two questions up in the order stated, under Maryland law, in order to be subject to assignment, a debt must have either actual or potential existence at the time of the assignment; that is to say, an assignment of prospective earnings is ineffectual unless the assignor had a potential interest in the future receipts under a contract existing at the date of the attempted transfer. Shaffer & Munn v. Union Mining Co., 55 Md. 74; Seymour v. Finance & Guaranty Co., 155 Md. 514, 142 A. 710; and Baust v. Commonwealth Bank, 158 Md. 280, 148 A. 236, are the three Maryland decisions defining this rule, which have the closest bearing upon the precise question here at issue.

The first of these cases involved construction of Chapter 273 of the Act of 1880 of the Maryland Legislature, prohibiting the payment of wages of employees of certain corporations otherwise than in legal tender, including the question as to whether the Act restricted the right of such employees to assign their wages. In the course of its opinion, upholding an assignment of the particular wages in question, the Court spoke as follows (55 Md. at page 84): "These orders are for the payment of wages already due, and for wages yet to be earned, and to become due; and they also provide that the payee shall receipt in the name of the drawer, and such receipt shall be good and conclusive against the drawer. The fact that wages to be earned, and not then earned, were included in the order (if there was no collusion to evade the law), could not effect the recovery for so much wages as might be due when the order was given, if the unearned wages were not assignable."

The second case involved an assignment of money to become due for work to be performed under an existing public works contract. The Court held that money subsequently earned under such a contract was assignable, saying (155 Md. at pages 530, 531, 142 A. at page 716):

"The first question, therefore, is: Did the appellee, by virtue of the assignment of the accounts, and the agreement between it and Hellbach, become entitled, not only to payments then earned, but also to future payments representing moneys earned sub-

sequent to the committee's taking charge of the contracts between Hellbach and the Pittsburgh board of education? The answer to this depends upon whether or not moneys earned after the assignment to the appellee are the proper subject of an assignment. * * *

"The weight of authority seems to be to the effect that a debt which has actual or potential existence is the proper subject of an assignment. The debt here, at the time of the assignment, had no actual existence, because it had not then been earned, but it did have a potential existence."

Later, in the course of its opinion, in interpreting Shaffer & Munn v. Union Mining Co., supra, the Court said (155 Md. at page 532, 142 A. at page 717): "While the court in that case expressed no opinion upon the question, the inference from the language used is that such assignments are valid, provided there is an existing enforceable contract under the terms of which future payments were to become due."

In the third case above referred to, a dairyman assigned to a bank money due him for milk which he shipped to a dairy company under an existing contract. For a considerable period prior to the time the assignments were executed, the dairyman had been making regular shipments of milk in the course of which he assigned funds accrued, and there was an understanding between the dairy company and the dairyman that shipments were to continue, and that they were to be paid for in installments at stated future dates, the Court saying (158 Md. at page 284, 148 A. at page 238): "It could reasonably be inferred that there was a continuing contractual duty of the assignor to make, and of the dairy company to accept, his customary deliveries of milk within the limits of the period with which this case is concerned. As the suit is not on the contract, there is no need of proof as to its precise terms. The validity of the assignments is sustainable· if the funds. purported to be transferred by them were to be earned under a contract in force when they were executed, and the record, in our view, sufficiently reveals that fact."

The Referee in his opinion does not specifically refer either to the Shaffer & Munn case or to the Seymour case, supra, but does analyze the Baust case, supra, and distinguishes it on the ground that (1) there was a binding contract for the sale of milk in the Baust case, whereas, in the present case, the canning or packing of the vegetables from the net proceeds of the sale of which the assignments provided the present petitioner-creditor should be paid, had no actual existence at the date of the assignments; and (2) the subject matter of the contract in the Baust case was not the milk which was to be produced in the future, but rather the cows which were already in existence. On this latter point the Referee seems to have been influenced by the fact that the claim of the assignee, the bank, was for part of the purchase money,—which it had advanced to the dairyman,—for these very cows.

On the first point, the Referee stresses the fact that, in the present case, at the time of the assignments, the bankrupt had not even contracted with the growers for the produce it expected to pack, saying, "Nor can the contract of December 31st, 1937, between the bankrupt and Sisk & Son be construed as a contract for the sale of goods to be produced in the future, so as to make the proceeds of such sale assignable. In the first place, the bankrupt was not obliged by that contract to produce any specified kind or quantity of goods, or, for that matter, any goods at all. It could have stopped operations in the year 1938 without breaching its contract with Sisk & Son. Concurrently, Sisk & Son were not obliged by that contract to take and pay for the pack of 1938. The most they were required to do was to use their best efforts to sell the goods to others, for which they were to receive 5% commissions."

Accepting the accuracy of the factual distinctions referred to by the Referee, I am, nevertheless, of the opinion that these distinctions are not really controlling, and that the Referee was in error in not finding the assignments valid in so far as Maryland law is concerned. Referring to the objection that the subject matter of the contract in the present case was not in existence at the time the contract was made, it is sufficient if the contract itself was in existence. For example, in the Seymour case, supra, the subject matter of the contract was the public works to be erected by the contractor and there the assignment was upheld in its entirety, despite the fact that the contractor had, at the time the assignment was made, done very little of the work required. But even if it be assumed that the subject matter of the contract must be in existence, it may accurately be said that in the present case the cans were as much the subject matter of the contract as were the cows in the Baust case. On the other

point, namely, that the contract between Sisk & Son and the bankrupt was not a binding one, assuming that the effect of the Maryland decisions is to require the existence of an enforceable agreement, we feel that such an agreement does exist in the present case. While it is true that the bankrupt might, if acting in good faith, and as a result of unforeseen circumstances, have closed its plant, and then Sisk & Son could not have obtained specific performance of their contract, nevertheless, the bankrupt was bound to order from Sisk & Son, and from no one else, any cans that it did use, and Sisk & Son, on their part, in the event any cans were ordered, were bound to use their best efforts to dispose of the bankrupt's pack, and thereby were to get paid for the cans so ordered. In short, as soon as one of the parties should elect to perform, the agreement became binding in character.

In view of the aforegoing, it is not controlling that the farmers' contracts with the bankrupt may all have been entered into after the assignments were made, and, a fortiori, that none of the farmers' crops were actually delivered prior to that time. Also, knowledge of the assignments on the part of the farmers is not a condition precedent to validity. There is no allegation of actual fraud upon them. At the time the assignments were made, the bankrupt owed nothing to any of them.

The Maryland rule which we thus interpret to be broad enough to render valid the present assignments is in accordance with the weight of authority in other jurisdictions. The general rule is thus stated in Williston on Contracts, Revised Edition, § 413: "It is obviously opposed to public policy to permit a man by means of any legal machinery to deprive himself of all rights which he may ever have in the future. Some limit must be set. Accordingly, though an assignment of a debt not yet due and which may never become due is effective if it appears that there is an existing contract or employment out of which the debt may arise, it is generally held that an assignment of a right expected to arise under a contract not yet formed, or employment not yet existing, is ineffective. Although this is an arbitrary limit and the rule is not universally followed, it seems based on wise policy and is adopted in the Restatement of Contracts." In support of this principle, Mr. Williston cites the Baust case, supra, among numerous others from various jurisdictions. See the Restatement of Contracts, § 154(2); also Chapman v. Emerson, 4 Cir., 8 F.2d 353; In re Bresnan, D.C., 45 F.2d 193; In re Goodhue Motor Co., D.C., 28 F.2d 402. In so far as Maryland law is concerned, we may assume that both assignments were to secure antecedent debts, and such does not affect their validity on the ground of lack of consideration, because, as already indicated, both assignments became complete when accepted by Sisk & Son, and they otherwise met the formalities requisite to a valid assignment of an account or debt, in Maryland. See T. J. Wilson v. Carson & Co., supra; Smith, Trustee v. Penn American Plate Glass Co., supra; also Annotated Code of Maryland, article 8, sec. 1.

We now turn to a consideration of the second question: Are these assignments, even though valid under the Maryland law, to be accorded priority under the Bankruptcy Act?

Prior to the amendment of the Bankruptcy Act in 1938, the rule in effect in this Circuit was that equitable liens given for antecedent debts, if created before the four months' period preceding bankruptcy, were valid and enforcible against the trustee in bankruptcy, and were not voidable as preferential even though the funds upon which such liens were a charge, were collected within such fourth months' period, or even after an adjudication in bankruptcy. This rule was recently announced in Union Trust Co. of Maryland v. Townshend, 101 F.2d 903, by the Circuit Court of Appeals for this Circuit; certiorari denied, 307 U.S. 646, 59 S. Ct. 1044, 83 L.Ed. 1526. There, it was held that the institution of bankruptcy proceedings against the seller of an interest in certain gas properties five days after the seller's agent had received corporate bonds in payment for such interest, did not affect the equitable lien upon the bonds so received by the seller's agent, which the Court held arose in favor of a bank, a creditor of the seller, by virtue of an agreement which had been made more than four months before the institution of the bankruptcy proceedings, by which the seller directed his agent to pay his debt to the bank from proceeds of the sale of his gas properties, when received by his agent; that is to say, that the bank, as holder of the equitable lien, was to be preferred, even though the bonds did not come into the agent's possession until within four months of the institution of the bankruptcy proceedings.

The Court relied largely upon Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995. In that case an equitable lien was enforced on securities which were retained in possession of a debtor until within four months of bankruptcy, on the ground that the debtor, prior to such period, agreed to, and had set them aside as security for the creditor.

In construing Section 60, sub. b, of the Bankrupcty Act as it stood prior to the amendments of 1938, 11 U.S.C.A. § 96, sub. b, whereby, in order to constitute a voidable preference, there was required to be not merely a transfer of property but also a mental element connected therewith, namely, that the person receiving it must at the time of the transfer have had reasonable cause to believe that it would affect a preference, the Court, in the Union Trust Company of Maryland case, supra, held that an inquiry as to the condition of the bankrupt's affairs at the time the property, which was the subject of the equitable lien, came into his agent's hands,—which was only five days before the institution of bankruptcy proceedings,—became immaterial, as did also an inquiry as to the knowledge, actual or imputed, of the creditor in whose favor the equitable lien arose, since the Court found, as above stated, that an agreement creating an equitable lien, not preferential at the time of the agreement, does not become preferential because of the condition of the debtor at the time that the lien attaches to subsequently acquired property. The Court found this principle to be analogous to the rule relating to the registration, within the four months' period of chattel mortgages, void as against lien creditors until registered.

The agreement creating the lien was made in West Virginia, and therefore was governed by West Virginia law. The Court found nothing in the statutory or common law of West Virginia in opposition to the recognition of the lien. It held that it made no difference that no contract had actually been entered into for the sale of the bankrupt's interest in the gas properties at the time the assignment was made which, as the Court found, created the equitable lien in the bankrupt's creditor, or, in fact, more than four months prior to bankruptcy, since the bankrupt had authorized his agent to sell such interest, and since it was property of value, and sale was reasonably anticipated, and the proceeds of the sale could reasonably be said to have had potential existence.

The Bankruptcy Act, prior to the amendments of 1938, also provided (section 67, sub. d, 11 U.S.C.A. § 107, sub. d) that "Liens given or accepted in good faith and not in contemplation of or in fraud upon the provisions of this title, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall, to the extent of such present consideration only, not be affected by anything herein." This section had no application to the facts in Union Trust Co. of Maryland v. Townshend, supra, because, although it is true the time for payment of the bankrupt's note was extended in return for the equitable lien, the debt for which this lien was given remained an antecedent debt.

So much for the effect, upon equitable liens of the kind involved, of the provisions of the Bankruptcy Act prior to the amendments of 1938, commonly known as the Chandler Act. It now becomes necessary to determine whether those amendments have produced a different result. There can be no doubt that the new Act governs the present case. It became effective September 22, 1938. The present proceeding was initiated by the filing of the petition in bankruptcy on March 9, 1939. The present bankrupt was not involved in any proceeding pending under the old Act, and no question of vested rights is involved. See Chandler Act, Secs. 6, sub. b, and 7, 11 U.S.C.A. Sec. 1, note.

Section 67, sub. d, just referred to, has been entirely eliminated by the Chandler Act. Section 60, subs. a and b, defining voidable preferences, to which allusion has heretofore been made in the course of considering the decision in Union Trust Co. of Maryland v. Townshend, supra, have been recast in the Chandler Act, but retained in substance, as follows (11 U.S.C.A. § 96, subs. a and b):

"a. A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, or of the original petition under chapter 10, 11, 12, or 13 of this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. For the purposes of subdivisions a and b of this section, a transfer shall be deemed to have been made at

the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to the filing of the petition in bankruptcy or of the original petition under chapter 10, 11, 12 or 13 of this title, it shall be deemed to have been made immediately before bankruptcy.

"b. Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property or, if it has been converted, its value from any person who has received or converted such property, except a bona-fide purchaser from or lienor of the debtor's transferee for a present fair equivalent value: Provided, however, That where such purchaser or lienor has given less than such value, he shall nevertheless have a lien upon such property, but only to the extent of the consideration actually given by him. Where a preference by way of lien or security title is voidable, the court may on due notice order such lien or title to be preserved for the benefit of the estate, in which event such lien or title shall pass to the trustee. For the purpose of any recovery or avoidance under this section, where plenary proceedings are necessary, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction."

■ It will thus be seen that if the present assignments were, in fact, given for antecedent debts, the last sentence of section 60, sub. a, just quoted, expressly prohibits application to the present case of the doctrine announced in Union Trust Co. of Maryland v. Townshend, supra, namely, that the voidability of the equitable lien is to be tested as of the time that the assignments were made and that if not preferential at that time, they do not become preferential by reason of the fact that funds upon which the lien attached may not have come into possession until within four months of bankruptcy. The testimony discloses that the first sales of any of the 1938 pack made by Sisk & Son for the bankrupt were on February 14th, 1939, that is, within four months of the filing of the

petition in bankruptcy; and since no funds as to which the equitable lien arising from the assignments could become a legal lien, reached Sisk & Son's hands prior to the filing of the petition in bankruptcy, the "transfer" did not become, prior to that time, "so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of" the Associated Seed Growers, Inc. Thus, the transfer "shall be deemed to have been made immediately before bankruptcy," and so, if it be a fact that it was given for antecedent debts, it became a preference under the Chandler Act, and may be voided by the trustee in bankruptcy if the Associated Seed Growers, Inc., at that time had reasonable cause to believe that the bankrupt was insolvent, since subsection a expressly provides that the rule therein laid down for determining when a transfer is to be treated as having been made, shall apply to sub-section b also, and we feel that a literal interpretation of both of the new provisions is required. Clearer language might have been employed.

It is to be noted that we have been considering these assignments as though they were both given for antecedent debts, although, as explained at the outset, it is not possible to determine with certainty from the testimony heard by the Referee whether such be the case. If they were not so given, but were given for new purchases in good faith, then, although as we have seen, the old provision of the Bankruptcy Act expressly protecting such transfers to the extent of the present consideration has been omitted in the new Act, it is not to be inferred from this omission that transfers for present consideration are now brought within the purview of voidable preferences. The inference is just the contrary, for if value has been given there has been no depletion of the bankrupt's estate and hence no preference. The definition of a preferential transfer in section 60, sub. a, of the new Act is confined to a transfer given "for or on account of an antecedent debt," and under section 60, sub. b, bona fide purchasers for present consideration from a preferred creditor are expressly protected; as is also the preferred creditor under Section 60, sub. c,—which remains as it was before the amendments of 1938,—by way of set-off, to the extent that he may have given new credit in good faith to the bankrupt.

In addition to the fact that it is impossible to ascertain with certainty, from such testimony as was given before the Referee, whether both the assignments were for present or past consideration, it is likewise impossible to determine from that testimony whether or not, at the time the transfers were "deemed to have been made," namely, "immediately before bankruptcy," the Associated Seed Growers, Inc., had reasonable cause to believe. that the Talbot Canning Corporation, bankrupt, was insolvent. Accordingly, it becomes necessary for the Court to refer the case back to the Referee for the purpose of taking further testimony bearing upon these two questions. After he shall have done so, it will become his duty to render a decision thereon. If he shall find, as a result of such additional testimony, that either of the assignments was for present consideration, then, in accordance with this opinion, it will become his duty to rule that to the extent of such assignment, the Associated Seed Growers, Inc. is entitled to priority out of the fund of $8,081.09 in the Trustee's hands. If, however, he should find with respect to either of the assignments that it was not given for present consideration, it shall be declared by him to be void as a preference, provided he shall also find that the Associated Seed Growers, Inc., at the time the transfer, as above defined, was made, had reasonable cause to believe that the bankrupt was insolvent.

An order will be signed in accordance with this opinion, referring the case back to the Referee, so that he may take further testimony, and thereafter rule upon the two questions left undecided by this opinion because of lack of adequate testimony.