## In re TALBOT CANNING CORPORATION.
### No. 9218.

District Court, D. Maryland.
July 11, 1941.

---

[7] Restatement of Law, Agency, Chap. 7, Sec. 245, Comment d., p. 550.

Z. H. Stafford, of Easton, Md., for bankrupt.

W. Brewster Deen and Wm. J. Rickards, both of Denton, Md., for trustee.

Thomas J. Keating, Jr., of Centreville, Md., for Associated Seed Growers, Inc.

T. Hughlett Henry, of Easton, Md., for objecting creditors.

COLEMAN, District Judge.

This is the second time this matter has been before the Court on petition to review the findings of the referee in bankruptcy. The present proceeding arises upon petitions of certain creditors of the bankrupt who object to the referee's ruling to the effect that another creditor, the Associated Seed Growers, Inc., is entitled to be treated as a preferred creditor in the amount of $8,081.09, less a pro rata share of costs and expenses incident

to the bankruptcy proceeding. The full amount of the last-named creditor's claim is $14,638.52, but the net proceeds in the hands of the trustee in bankruptcy out of which creditors' claims must be paid, amounts to only $8,081.09.

The referee had originally refused to allow, as a preferred claim, any part of the claim of the Associated Seed Growers, Inc., after hearing objections to such allowance which had been filed by the trustee in bankruptcy and certain general creditors of the bankrupt. Thereupon, the Associated Seed Growers, Inc., filed a petition asking this Court to review the referee's decision. As a result of the hearing by this Court, it became necessary to refer the case back to the referee for the purpose of taking further testimony upon two questions, upon the answers to which depended a determination of whether the Associated Seed Growers, Inc., could be treated as a preferred creditor; namely, (1) were certain written assignments, two in number, from the bankrupt to the Associated Seed Growers, Inc., given for present consideration or for or on account of an antecedent debt; and (2) did the Associated Seed Growers, Inc., have reasonable cause to believe the bankrupt to be insolvent at the time these assignments were "deemed to have been made" within the meaning of the Bankruptcy Act, namely, immediately before bankruptcy?

The earlier opinion of this Court thus states the purpose of the re-reference to the Referee and the questions submitted for his determination (35 F.Supp. 680, 688): "In addition to the fact that it is impossible to ascertain with certainty, from such testimony as was given before the Referee, whether both the assignments were for present or past consideration, it is likewise impossible to determine from that testimony whether or not, at the time the transfers were 'deemed to have been made,' namely, 'immediately before bankruptcy,' the Associated Seed Growers, Inc., had reasonable cause to believe that the Talbot Canning Corporation, bankrupt, was insolvent. Accordingly, it becomes necessary for the Court to refer the case back to the Referee for the purpose of taking further testimony bearing upon these two questions. * * * If he shall find, as a result of such additional testimony, that either of the assignments was for present consideration, then,

in accordance with this opinion, it will become his duty to rule that to the extent of such assignment, the Associated Seed Growers, Inc., is entitled to priority out of the fund of $8,081.09 in the Trustee's hands. If, however, he should find with respect to either of the assignments that it was not given for present consideration, it shall be declared by him to be void as a preference, provided he shall also find that the Associated Seed Growers, Inc., at the time the transfer, as above defined, was made, had reasonable cause to believe that the bankrupt was insolvent."

Pursuant to the aforegoing direction, the Referee took further testimony and heard argument with respect to the questions referred to him, and has filed his findings of fact and conclusions of law thereon as already explained. It is with respect to these that this second review has been sought.

With respect to the first question as to whether the two assignments to Associated Seed Growers, Inc., were given for present consideration or for or on account of an antecedent debt, the Referee found that the earlier assignment, namely, that dated February 3, 1938, was for a present consideration, but made no finding as to the second assignment dated March 19, 1938, for the reason that the first assignment covered an indebtedness of the bankrupt aggregating $14,150.25 of which there was a balance due at the commencement of the bankruptcy proceedings of $8,777.50, or more than the total of the funds in the hands of the trustee in bankruptcy available for distribution to creditors.

In view of the fact that this Court has covered in detail, in its original opinion, the character of both of these assignments, suffice it to give here merely an abbreviated statement with respect to them.

On December 7, 1937, the Associated Seed Growers, Inc., deeming the financial condition of the bankrupt unsatisfactory, instead of insisting upon strict compliance with the terms of written contracts which it had made with the bankrupt, dated January 12 and February 15, 1937, which entitled it under such circumstances to cash payment in advance of delivery, merely demanded security of the bankrupt, with the result that the two assignments in question were given to the Associated Seed Growers, Inc., one on February 3, 1938, and the other on March 19, 1938, in the form of letters addressed to the

bankrupt's brokers, which were accepted in writing. In the first assignment it is stated that on its date, namely, February 3, 1938, the Associated was owed by the bankrupt $14,150.25 as a result of contracts for the growing and delivery to the bankrupt of seed for its 1938 pack. The statement is as follows: "We are indebted to Associated Seed Growers, Inc. of New Haven, Conn. in the aggregate sum of $14,150.25 on account of the purchase of certain lima beans, stringless beans and pea seeds, and it has been agreed between said Associated Seed Growers, Inc. and ourselves that we shall authorize, empower, direct and order you to pay over, from time to time, to said Associated Seed Growers, Inc., or to whomsoever it may direct, toward the payment of said indebtedness of $14,150.25, such sum or sums as shall be equivalent to * * *", and then follows a statement of the various rates at which Associated should be paid by Sisk out of any balances due the bankrupt after its indebtedness to Sisk was liquidated pursuant to the terms of the formal written contract which the bankrupt had with Sisk dated December 31, 1937, whereby the latter was to act as its canned goods broker.

We conclude that this first assignment of February 3, 1938 was "made for or on account of an antecedent debt", and that therefore it is a preference within the definition of the Bankruptcy Act, Sec. 60, sub. a, 11 U.S.C.A. § 96, sub. a. Indeed, we had already so found by our earlier opinion in which we stated (35 F. Supp. 680, at page 682): "The first [assignment], it is to be noted, was clearly for an antecedent debt, namely, past due accounts." We, therefore, intended, although may not have made it entirely appear in the closing paragraph of the opinion, that further consideration by the referee of this first assignment was required only in connection with the question whether at the time it was deemed to have been made, Associated had reasonable ca..,e to believe the bankrupt was insolvent.

The referee found that this assignment was not for an antecedent debt on the theory that the taking by Associated of security for the purchase price, instead of demanding payment in advance of shipment of the seed earlier contracted for, amounted to a new contract. But even if ·

there was a new contract in the sense that each party promised to do something that it was not already bound to do, and that, therefore, there was sufficient, new consideration on the part of each to support the promise of the other,—the promise of Associated to demand less than it had a right to do, i.e., security instead of cash before delivery; and the promise of the bankrupt to give security instead of paying cash in advance of delivery,—the fact remains that the bankrupt gave the security for an antecedent debt. The assignment says so. The referee himself admits it when he says in his findings that "it is true that the Associated Seed Growers could have held Talbot Canning Corporation for the purchase price of these seeds and could have compelled acceptance if the matter had come to a question of the liability of the buyer under the contract. This is beside the point however under the circumstances."

The referee appears to have failed to make proper distinction between performance under the contract and liability, for he continues: "What the Associated Seed Growers was interested in was to secure the payment of the purchase money. It was unwilling to go forward with the contract unless secured, and it was justified under the terms of the contract in demanding cash before shipment. The taking of security instead amounted to a novation." Thus by the course of reasoning which the referee appears to have followed, most compromise settlements of debts owed by one subsequently becoming bankrupt could escape the ban of being voidable preferences under the Bankruptcy Act on the theory that the agreements of compromise were "new" contracts. So they might .well be, but the obligation of the debtor, whether or not reduced in amount; whether secured when it was previously unsecured, or whether altered in a variety of other ways, remains still an old obligation, a debt antecedent to the "new" contract made for the sole purpose of liquidating it because it is an antecedent debt.

It is true that the original agreements between the Associated and the bankrupt are very loose in their provisions with respect to when payment shall be made by the bankrupt for the seed agreed to be grown and delivered by Associated. The seller merely agreed to deliver when instructed by the buyer, and with respect

to payment, while quantities in pounds and prices per pound are set forth in the contract, there is no express statement as to time of payment, although certain discount rates are quoted for payments made prior to certain dates,—all prior to May 1, 1938, nevertheless, since it is expressly provided that the seed which the seller agrees to produce and deliver is "for the crop of the current year," which, in the trade obviously meant the year 1938, it must be implied that the buyer obligated himself to take all of the seed in time for the 1938 season's planting. This is confirmed by the statement in the second assignment (dated March 19, 1938) to the effect that "Since our letter of February 3, 1938 the pea seed which was included in the aggregate sum of $14,150.25 has been shipped * * *."

■ Furthermore, the referee appears to have treated the obligation of Associated as controlling, whereas, obviously, it is the obligation of the bankrupt with which we are here primarily concerned in construing the Bankruptcy Act. He says "The testimony is also uncontradicted that these seeds would not have been shipped unless these assignments of February 3, 1938 and March 19, 1938 were given. * * * There is sufficient consideration to support the new arrangement in that the Vendors were doing something they were not legally bound to do. They were not bound to ship these seeds unless they secured cash in advance. It was within their discretion to determine whether the financial condition of the purchaser was satisfactory. They determined that it was not."

■ While the referee made no finding, for the reasons already stated, with respect to the second assignment dated March 19, 1938, it seems even more clear that present consideration was likewise lacking for this assignment. A verbal contract between the bankrupt and Associated had been made in the latter part of February 1938 for the purchase by the bankrupt from Associated of 700 bushels of Alaska pea seed which Associated happened to have on hand (not having grown this seed under a year-old contract as was the case with the other seed here involved). This seed was shipped by Associated prior to March 19, 1938, payment to be made according to the customary credit terms. Some time after shipment, the assignment of March 19 was requested and given. Clearly, this assignment was to secure an antecedent debt. It says so as follows: "Since our letter of February 3, 1938, the pea seed which was included in the aggregate sum of $14,150.25 has been shipped and we find that it was necessary for us to make an additional purchase of 700 bushels of pea seed, *increasing our debt* to the Associated Seed Growers, Inc. by $2,310.00, now making an aggregate sum of $16,460.25. We therefore respectfully request that this letter be made a part of our letter of February 3, and the amount that we consider due the Associated Seed Growers, Inc. be $16,460.25." (Italics inserted.)

■ We now turn to the second and sole remaining question, namely, Did Associated have reasonable cause to believe that the bankrupt was insolvent at the time the assignments must, according to the Bankruptcy Act, be "deemed to have been made", i.e., "immediately before bankruptcy." As explained in the previous opinion, even though, as we now find, the assignments were not for present consideration, they cannot be voided as a preference under the Bankruptcy Act unless it shall also be found that Associated "immediately before bankruptcy" had reasonable cause to believe that the bankrupt was insolvent.

■ The Referee states that "After considering all of the testimony, I am of the opinion that Associated Seed Growers was in possession of information which if followed, it would have led to knowledge that Talbot Canning Corporation was insolvent at the time the assignments were made." With this conclusion we agree after a review of all the evidence that was heard by the Referee. It is well settled that one taking a transfer, under the circumstances that here existed, may not rest merely upon what he actually knows about the financial condition of the transferor, but he is charged with knowledge of what reasonable inquiry would have disclosed. Abdo v. Townshend, 4 Cir., 282 F. 476; Grandison v. National Bank of Commerce, 2 Cir., 231 F. 800, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; Boston National Bank v. Early, 1 Cir., 17 F. 2d 691; Pender v. Chatham Phenix National Bank & Trust Co., 2 Cir., 58 F.2d 968; Irving Trust Co. v. Commercial Factors Corp., 2 Cir., 68 F.2d 864; In re Llewellyn, D.C., 15 F.Supp. 653, affirmed

National Dime Bank v. First Nat. Bank, 3 Cir., 89 F.2d 51.

The referee's conclusion seems clearly to be supported by the weight of the evidence.

■ As pointed out in this Court's earlier opinion, this case is to be governed by the provisions of the Bankruptcy Act as amended in 1938. See 35 F.Supp. 680, at page 686. Prior to these amendments a transfer was voidable by the trustee if made within four months before filing of a petition in bankruptcy, or after the filing of the petition and before the adjudication, and when the bankrupt was insolvent, provided the transferee had reasonable cause to believe that the enforcement of such transfer would effect a preference. Sec. 60, sub. b, 11 U.S.C.A. § 96, sub. b. However, also as explained in the Court's earlier opinion, by the 1938 amendments, for the purposes of determining the voidability of a preference, "a transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to filing of the petition in bankruptcy * * *, it shall be deemed to have been made immediately before bankruptcy." 11 U.S. C.A. Sec. 96, sub. a. Since the first sales of the 1938 pack made by Sisk for the bankrupt were within four months of the filing of the petition in bankruptcy; and since no funds as to which the equitable lien arising from the assignments could become a legal lien, reached Sisk's hands prior to the filing of the petition in bankrutpcy, the "transfer" did not become, prior to that time, "so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of" Associated. Therefore, the transfer "shall be deemed to have been made immediatly before bankruptcy." Accordingly, since these assignments were given for antecedent debts, they became a preference under the Act as amended and may be avoided by the trustee if Associated "immediately before bankruptcy" had "reasonable cause to believe" that the bankrupt was insolvent, 11 U.S.C.A. § 96, sub. b. In other words, under the Act as amended, the definition of a voidable preference is materially broadened.

■ Applying the test, then, as required by the present law, we can have no doubt as to the correctness of the referee's conclusion on this point. As early as August 22, 1938 Associated called Sisk's attention to the fact that the latter was not living up to its undertaking to pay over to Associated, monthly, any balance in Sisk's hands due the bankrupt resulting from the sale of canned goods. The following day Sisk wrote Associated, requesting the latter to give to it a written promise to refund any money paid to Associated in case a receivership or bankruptcy occurred and Sisk should be required to account for payments made by it out of funds in its hands owing to the bankrupt. Thereupon, Associated was led to inquire as to the bankrupt's actual financial condition. While the information given by Sisk is somewhat vague and to the effect that Sisk did not want the indemnity through any actual fear of receivership, in spite of repeated demands by Associated for the amounts accumulated in Sisk's hands for Associated's credit, no further payments prior to bankruptcy were ever made to Associated, although Sisk was obligated to make payments monthly and promised to remit upon receipt of agreement to idemnify, which Associated did, in fact, ultimately give on September 15, 1938.

Apparently, Associated at this time felt it was amply secured by the assignments taken, and gave little thought except to the market value of the canned goods in Sisk's hands. However, we are satisfied that the facts thus briefly summarized were more than sufficient to put Associated on notice that the bankrupt must have been insolvent a considerable length of time prior to the date when the petition in bankruptcy was filed, namely, March 9, 1939. It is true there is no financial statement of any date prior to bankruptcy which shows insolvency. While the bankrupt's financial condition was dependent upon the outcome of Sisk's sales of the canned goods, we are not prepared to say that a reasonably accurate statement could not have been prepared. Since, as we have seen, we are concerned only with what Associated had reasonable cause to believe, immediately before bankruptcy,

864

was the bankrupt's financial condition, we cannot escape the conclusion that Associated had more than ample information to indicate to it that the bankrupt was then insolvent, as it must have been.

 The change in the law may be said to be harsh in its operation with respect to creditors finding themselves in the position in which Associated found itself. However, it is the obvious intent of the language employed in the amendments to enable a trustee in bankrutpcy to reclaim under conditions which would not have rendered reclamation possible under the old Act. The obligation clearly rested upon Associated to insist upon having a disclosure of the bankrupt's indebtedness to other creditors which, set off against even an approximation of the amount to be realized from the sale of the canned goods in Sisk's hands, would indisputably have shown the insolvency of the bankrupt in the month of March, 1939, as well as considerably prior to that time.

To summarize, we conclude that the referee was in error in finding that the assignment of February 3, 1938, was for present consideration, and in giving to the claim of Associated the status of a preferred claim for any amount. While the referee's other ruling, in which we concur for the reasons just explained, that Associated had reasonable cause to believe immediately before bankruptcy that the bankrupt was then insolvent, was immaterial in view of his first conclusion, since we are now reversing the latter, his other ruling, in which we concur, becomes material, and forms the second and concluding factor in denying the right of Associated to be treated as a preferred claimant.

In view of our conclusions, it becomes unnecessary to consider the other questions raised by the petitions for review, concerning the status of certain County and State tax claims. No question now arises as to a share of these taxes being allocable to Associated, since Associated is found to be merely a general creditor. The status of these tax claims is to be determined strictly in accordance with the provisions of Section 64 of the Bankruptcy Act, 11 U.S.C.A. § 104, as interpreted by this Court and explained in detail in a very recent decision of this Court, In re Cecil J. Beardsley, D.C., 38 F.Supp. 799.

Accordingly, the action of the Referee is reversed, and Associated is to be classed as a general creditor in the distribution of the funds now in the trustee's hands.